At this time, we will hear United States v. Singletary. Good morning, Your Honor, and may it please the Court. My name is John Goetz, and I represent Mr. Singletary in this matter. And Your Honor, I would submit that with regards to the key issue before the Court, that all three components are met in Mr. Singletary's case to constitute a Brady violation when, after three years of litigation, for the first time at trial, while testifying, a probation officer, Robert Masucci, testified that he lied, and by proxy, then-police officer Amy Pfeffer lied, when providing the collection of, reviewing of, and processing of the key evidence in Mr. Singletary's case. Now, Your Honor, I relied heavily in our briefs with the Luca v. Portunato case. I think Your Honor is fully aware of that case as you've authored it. Yes, I'm familiar with it. I mean, in Luca, the conclusion was that the identification of a key witness was made during trial or so close to trial that the defense could not use that information. It was the identification, actually, of a witness who was a former police officer who was located in Florida. But in this case, you may have been advised in an untimely way, but was it such that you were, were the circumstances such that you could not use it? Because I think you, as I see you, you cross-examined, you made the argument, you pressed it home. And Your Honor, with regards to the third prong or the third component, I would suggest in the government, I think Mr. Karaschewski gave some kind words to my cross-examination of Mr. Masucci. But I'd suggest to Your Honor, yes, there is prejudice here, and if I can explain why. It goes first, Your Honor, to the beginning of this case. And I don't want to presuppose what the government may or may not have done should they have learned that the way that this evidence was actually handled was incorrect. But I would submit to this Court that when you look at the specific facts of this case, that you have Amy Pfeffer who testified in a suppression hearing, at no time did the government say, oh, by the way, this was not collected the way Amy Pfeffer said it was. This was something completely different. And when you have a situation where that case went, as this Court is aware, that case went all the way up to this Court as it relates to the trier fact that the district court finding that the evidence should have been suppressed, he granted the suppression of the evidence. And I would submit to this Court that when you review the evidence from that stage of litigation, and even before that, with the filing of motions, if you will, for omnibus motions, that there is key evidence here as to not only her credibility, but the potential, and I say potential because we don't know what we could have found because we don't have it, but the potential of finding more evidence relating to the situation surrounding, again, who actually seized the evidence, who collected the evidence. I have to say, quite candidly, Your Honor, notwithstanding what the government has said in their brief, I was caught flat-footed. I never had been in a position where I had a law enforcement member say that they lied when collecting evidence. And when you look at the evidence before you... There are a number of inferences you can draw from this, and one of them is that this person lied because the evidence was not collected at the scene, or the evidence was fabricated. And that's what you urged the jury to conclude, or you suggested that that was plausible. And under usual circumstances, if somebody lies about the collection of evidence, that's an available inference. But the alternative inference is that Amy Pfeffer was a police officer, and Mr. Masucci was a probation officer, and he couldn't have filled out the forms, and he couldn't have filed it with the police department because he didn't work for them. And that was another available inference, and that's the one the jury drew. Isn't that actually more plausible? I would suggest no, Your Honor, and let me explain why. When you look at every single document, but more importantly, for example, I believe on the Appendix 152, there's a photograph. And in that photograph of the firearm, it's the evidence bag, and the evidence bag has some key pieces of information, including the fact that it was Amy Pfeffer who testified that she collected that firearm. Now also, Your Honor, and as this Court is aware, with the chain of custody, you have a situation where on the ceiling of the bag, there's a signature. So it's not just the collecting officer, but there's a signature. And I apologize, because quite candidly, the photo isn't the best. But there's a signature that has Pfeffer as the person who supposedly sealed that evidence. And I think it's quite telling, Your Honor, when you look at the testimony of Officer Motse, Rochester Police Officer Motse, who was called by us, when asked whether he would allow somebody to sign his name like that or vice versa, and his answer was quickly no. And when asked why, he says, well, because that would be a crime. And I would suggest, Your Honor, when you have Mr. Masucci get up there and say he did all of those things, that that is something that quite candidly goes beyond what I was able to draw, I would suggest, what I was able to draw out right at the time of trial. I had candidly no opportunity to really investigate the next stages. And this goes back to the beginning. As this Court is aware, in the appendix, there were three motions and women he made prior to trial, with the first one being six weeks before the trial began, addressing these very issues, I would suggest to the Court, addressing these very issues. And when you look at what was happening on those issues, again, at no time did the government say, oh, by the way. We understand that. But here's my problem. What you need to show is whether had there been earlier disclosure, you really would have gotten somewhere with it, and that we therefore should conclude that you didn't get a fair trial, your client didn't get a fair trial. Now we can imagine all kinds of possibilities of varying degrees of probability of what might have happened if, like for want of a nail, the kingdom is lost kind of possibilities. But I don't understand how, given the use you did make of it at trial, you didn't get a fair trial. You're just asking us to read the materiality test out of the Brady situation, because it's always true that if something is revealed late, you could imagine some hypothetical circumstance where had it been disclosed in a more timely fashion, something might have been different. But I think something might have been different isn't the test. And Your Honor, I think to follow up on your question is that the heart of it is, is this a verdict worthy of confidence? And I think I would suggest to this Court the answer is still no, and the reason being, as you pointed out, Your Honor, we can do hypotheticals throughout. But at the end of the day, the trial has commenced. We have a complete turnaround as to what is in that evidence. And I would suggest to the Court . . . Well, no. You have a complete turnaround as to who put the signature on the bag. But it's more than that, Your Honor, respectfully. And let me explain why. And I'm about to run out of time if I can just answer that question. Go right ahead. Thank you, Your Honor. The reason that it's more than that is because, again, you start at the beginning of this investigation. There are questions throughout, and as the Court saw, Mr. Singletary steadfastly maintained that he did not have that unloaded firearm throughout. And you have questions as to how the evidence of the video, you had video, but the video, parts of the video are gone. There's a technician there, but there's no photographs taken of how the firearm was actually seen. And you start building those steps. And as this Court is aware, when doing a trial, it's the foundation work. It's building those steps. And we never had that opportunity. I get that. Candidly, I think I even asked at one point for the Court to consider an in-camera review of the law enforcement officer's disciplinary records because of what happened with Ms. Pfeffer. That was denied. I would suggest that had I had that earlier, again, I don't know what the district court would have done, but I would say that there is now a real bigger concern as to whether or not this verdict is worthy of confidence. If you, we know that you could not have gotten Pfeffer's testimony, because as you point out, what happened is a crime, and she was asserting the Fifth Amendment. That's correct, Your Honor. So you couldn't have gotten Pfeffer's testimony on this, and you had Masucci on the stand. And he was not resisting you. He was basically conceding that what he did was more than irregular, it was wrong. So the question becomes, what else could you have gotten here, specifically, and I'm not sure I've heard it, but we'll hear you on rebuttal. Thank you, Your Honor. May it please the Court. My name is Joseph Karashevsky, I represent the United States on this appeal. The district court did not abuse its discretion in denying the Rule 33 motion. And as a matter of fact, the district court heard all the arguments that Mr. Singletary is making before this court, twice actually, once right after Officer Masucci's testimony, after which defense counsel made a motion to strike his testimony. The district court heard the arguments and said, well, that goes not to admissibility of the evidence, but to the weight of the evidence. And in fact said, you'll have something to point out to the jury, or you'll have something to talk about on cross-examination. So that was the first time. The second time was in the Rule 33 motion, which occurred after trial, in which for the first time it was framed as a Brady violation. And the district court took a look at that, and focused precisely on the appropriate issue. That issue being, if there was a retrial, what would be different? What would you be able to do if this realization as to who actually sealed the evidence? Maybe Mr. Getz would have been able to ask the prosecution to offer immunity to Officer Pfeffer. And the judge might have pushed him into doing that. Actually, with regard to that Fifth Amendment issue, the Fifth Amendment issue is not that clear from the record. The Fifth Amendment actually occurred, she took the fifth when she was called to testify in some other cases, some state cases. In which she, which directly involved, that's what directly led to her discipline in the Orchard Park Police Department, so that's where the Fifth Amendment came in. And there was, I mean, the record indicates that Ms. Pfeffer, Officer Pfeffer, who was no longer an officer of any police department at that point, really was not in any shape to testify, she just wasn't. And the government didn't call her, we instead put on Officer Masucci. The issue is not whether you would have reasonably called her. The question is whether the defense would have been able to put itself in a position where it might have been able to interview her, call her, seek immunity for her, and find out what it is she might have said. She is a bad actor. Well, she, and not necessarily in this case, Your Honor. She had some tough disciplinary things and really, probably appropriately, was dismissed. She was cashiered, and that's pretty telling. Well, I mean, yes, she was no longer with the police department that she went to after the Rochester Police Department. So, yes, and that was disclosed to the defense. We disclosed that to the defense. I think she might have been, well, you disclosed it, but when did you disclose it? Before trial. Before trial, that she was- I don't remember exactly how long before trial, Your Honor, but there's no claim made that they did not timely receive this information about Officer Pfeffer. That's not a claim on this appeal, that they did not timely receive that information. Actually, it was well before- I understand that, but then the question is, how important is Officer Pfeffer? And if, until you find out that there was this mislabeling, her testimony would be seen in a new light, wouldn't it? Well, it was, I will say, I'm recollecting now, Judge, it was months before trial, Mr. Gatz can correct me if I'm wrong, that the information about Officer Pfeffer being dismissed from her position at the Orchard Park Police Department was made known to the defense. As a matter of fact, there was an article in the Buffalo News about it, and Mr. Gatz actually pointed it out to me and to the prosecutor who was trying the case, so that was well known. The disciplinary problems that Pfeffer had were well known. Let me come back to the disclosure we've been talking about directly. Am I correct that the government disclosed her resignation on September 11th? I don't remember if that's the exact date. About a month before the trial. I would not quarrel with that date, Your Honor. And so, when exactly, if you can tell me, was the disclosure about the evidence bag made? Well, the evidence bag actually, and I don't quarrel with this either, that the fact that Masucci's testimony that I'm the one who sealed this, and I wrote Pfeffer's name on the envelope, that happened at trial. And it was a three day trial? It was a pretty short trial. And when did Masucci testify? He was one of the first witnesses, I believe. On the first day? Yeah. Yes, Your Honor. And the case was tried in Buffalo or Rochester? In Rochester. Okay. So, and where was Pfeffer? Pfeffer was somewhere in the district, probably more west, probably in Buffalo somewhere. So probably within an hour's drive of- Yes. So, nothing stopped counsel from attempting to locate and speak to Pfeffer? Well, that's correct, Your Honor. And no request for a continuance was made. We made that point in our brief, that the defense at no time asked for a continuance and said, boy, I really need to get Pfeffer in here or figure out a way where I can get Pfeffer's testimony on the record. And so, with regard to the determination that the district court made, no abuse of discretion here. The judge who sat through the trial, listened to the arguments, the same arguments that Mr. Goetz is making to this court here today, and said that the jury heard at this trial, Misucci's admission that what was on those evidence bags was not accurate. And as you noted, Judge Jacobs, kind of acquiesced in the characterization of that as a lie. I'm not sure that that's the proper characterization, but at any rate, Misucci said, it was asked, that's a lie. He said, yeah. Did the defense ask the government to immunize Pfeffer? No. They asked the judge? No. Do anything in that regard? No. Thank you. So the, and the suggestion that there might be a better opportunity to cross examine Misucci in this case, or with more preparation there could have been a better opportunity, frankly, the defense counsel hit a home run here. He got a witness to say on the stand, I lied. Could the judge have confirmed use immunity without the government asking for it? I don't think so. Haven't we ruled the defendant has no right to get it? Yes, that's correct, yes. And so I think that the district judge took a look at everything that was relevant here, asked the correct question, focused in on, would this make a difference in a second trial, said the answer was no. And denied the motion. So unless there's anything further from the court, I would ask this court to affirm the judgment of the district court in all respects. Thank you. We'll hear rebuttal. Thank you, Your Honor. And to answer one of the court's questions, it was actually us who found out that Ms. Pfeffer resigned. And we pointed that out to the government. So we were out investigating. Was that in the newspapers? It was also in the newspapers, but candidly, I had heard from another attorney in the Buffalo region, because I had an investigator trying to find. And I apologize, this is not in the record, but I think it is relevant to point out some of the issues that the court has addressed. And as soon as we had heard about that, Your Honor, that's when that first motion in limine kicked off, if you will, that August motion in limine. because we see there's clearly important evidentiary issues for the district court to address pre-trial. We wanted to make sure that those issues were properly set before the court. And again, at that point, at no time did the government say, hey, first, they didn't say that Pfeffer was not going to testify. That information did not come through that she was actually going to exercise her constitutional right to remain silent until, frankly, just prior to this trial. Almost a week before trial, wasn't it? The first letter that came through said that. But then it, and to address your question, Your Honor, to counsel, no, I didn't ask for a continuance. I made a motion to preclude. I think that at that time, again, I was caught flat-footed. But we were attempting to try to find Ms. Pfeffer, and I think that's important to note. And there was no point in time where the government indicated that they would grant Ms. Pfeffer immunity as it related to this specific issue. With regards to the evidence, it was more than the bag. It was the testimony, because the whole thing switches from this, and I think it's important to look at these two avenues. The suppression hearing, Ms. Pfeffer is saying, I found the gun. I found the marijuana. I did this, all the way down the line. It's not until the time of trial that it's Mr. Masucci that's saying, he found the gun. He did this. And I would suggest that that is important when relating to the materiality issue. Unless there's other questions, I see my time is up. Thank you. Thank you. We'll resume decision.